UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

─────────────────────────────────────────────────────

D.H., a minor, by her mother
and natural guardian,
BRIDGETT HEATH,

                Plaintiff,

        v.                               Case No. 07-C-309

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.

─────────────────────────────────────────────────────

**DECISION AND ORDER REVERSING DECISION OF THE COMMISSIONER AND
REMANDING CASE**

        D.H., a minor appearing by her mother, Bridgett Heath, (separately, "D.H."

and "Heath," collectively, "Plaintiff"), seeks judicial review of the Commissioner's denial of

her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

        Plaintiff filed an application for SSI in September 2003.  (R. at 45-47.)  The

Social Security Administration denied her application initially and on reconsideration.  (R.

at 33, 39.)  Plaintiff then requested an administrative hearing by an Administrative Law

Judge ("ALJ").  (R. at 43.)  The ALJ conducted a hearing on August 10, 2006, (R. at 207),

and denied plaintiff's claims on November 13, 2006.  (R. at 9).  The Appeals Council

denied plaintiff's request for review.  (R. at 3.)  The ALJ's decision then became the final

decision of the Commissioner, and plaintiff filed this action.

# I. FACTS AND BACKGROUND

A. Medical Evidence

D.H. was born on December 1, 1993, with congenital syphilis and a complication from Trichomonas. (R. at 153.) The child's umbilical cord ruptured prior to delivery and meconium-stained fluid was present. (R. at 153.) Heath later represented to doctors that the umbilical cord was wrapped around D.H.'s neck at birth. (R. at 158.) Low Apgar scores were reported. (R. at 158.) D.H. also presented at birth with multiple facial petechiae, "marked" edema around the eye socket, and respiratory distress. (R. at 153.) These conditions led to D.H.'s transfer to the University of Iowa Hospital. (R. at 153.) While there, D.H. was treated for respiratory difficulties, as well as fluid and nutrition abnormalities. (R. at 153.) She was found to have bilateral subconjunctival hemorrhages and retinal hemorrhages believed to be caused by birth trauma. (R. at 153.) A brain ultrasound revealed normal symmetrical ventricles but increased echogenicity in the periventricular regions. (R. at 153.) D.H. was deemed to be stable neurologically and stayed at the University of Iowa Hospital for three weeks. (R. at 153, 158.) Doctors diagnosed D.H. with cerebral palsy. (R. at 156, 158.)

In 2000, D.H. was treated on multiple occasions for a left Achilles tendon contracture. (R. at 156, 158-59.) Dr. David Walsh conducted a neurological examination in August 2000, related to D.H.'s leg length discrepancies, tight left heel cords, pronounced limp, and difficulty running. (R. at 154.) At this visit, Heath reported D.H.'s limp had become more noticeable and that D.H. would toe walk. (R. at 155.) Heath was also concerned about D.H.'s development as D.H. was having difficulty in school and had failed kindergarten. (R. at 155.) Dr. Walsh found D.H. legally blind in the left eye and diagnosed D.H. with static encephalopathy with persistent nonprogressive

2

symptomatology. (R. at 154.) The doctor stated D.H.'s gait problems were due to cerebral palsy and most likely asymmetric diplegia. (R. at 155.) A magnetic resonance imaging (MRI) scan revealed gliosis which the consultation doctor attributed to D.H.'s injuries sustained at birth. (R. at 157.) D.H. continued to undergo physical therapy for her gait and left leg strengthening. (R. at 151-52.)

Another MRI scan was completed in October 2002. (R. at 98.) This scan found abnormally increased signal and volume loss of mild to moderate degree in the periventricular white matter. (R. at 98.) The impression of the scan was mild to moderate periventricular gliosis. (R. at 98.)

D.H. went to Dr. John Thometz for left foot and left shin pain in February 2003. (R. at 110.) Dr. Thometz noted D.H. had gait abnormalities. (R. at 110.) D.H. would walk on the toes of her left foot and would exhibit left foot supination. (R. at 110.) After subsequent visits and tests, Dr. Thometz diagnosed D.H. with a left equinovarus foot deformity, a weak anterior tibia, and Achilles tendon contracture. (R. at 108.) D.H. then underwent surgery to lengthen the Achilles tendon, transfer the anterior tibial tendon, and lengthen the posterior tibial tendon on her left lower extremity in May 2003. (R. at 102-03.)

Dr. Daryl Melzer evaluated D.H. in February 2004, and completed a disability report. (R. at 118-20.) Heath reported to Dr. Melzer that D.H.'s gait had improved since the left foot surgery but that D.H. still limped somewhat when walking. (R. at 118.) D.H. told Dr. Melzer that she could run, but Heath said D.H. would skip and hop when she ran. (R. at 118.) At the time of this evaluation, D.H. was in third grade "regular" classes with poor grades, and received "special help" periodically. (R. at 118-19.) In addition, Heath informed the doctor that D.H. completed age-appropriate self-care functions. (R. at 119.)

3

Dr. Melzer found D.H.'s corrected vision to be 20/25 for her right eye and greater than 20/200 for her left eye. (R. at 119.) D.H.'s motor strength was determined to be "essentially normal." (R. at 120.) Moreover, Dr. Melzer noted that D.H.'s left leg was three-fourths of an inch shorter than her right leg and that D.H. at rest would stand with her right leg mildly flexed. (R. at 119-20.) The doctor believed D.H.'s gait was "quite good" and observed that D.H. could hop on her right leg but not on her left leg. (R. at 120.) Dr. Melzer concluded D.H. had mild cerebral palsy with a short left leg and status post heel cord lengthening. (R. at 120.) Also, he determined that D.H. had markedly poor vision in her left eye and that D.H. needed extra assistance in school. (R. at 120.)

Later in February 2004, Dr. Mary Harkness, a state agency physician, completed a childhood disability evaluation form regarding D.H. (R. at 126-31.) D.H.'s impairments were listed by Dr. Harkness as mild cerebral palsy, status post surgery for an equinovarus deformity, and left eye blindness. (R. at 126.) Dr. Harkness determined that D.H.'s "combination of impairments [was] severe, but [did] not meet, medically equal, or functionally equal the listings." (R. at 126.) Next, Dr. Harkness conducted a functional equivalence evaluation and found no limitation in the five domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself. (R. at 128-29.) Dr. Harkness did find a "less than marked" limitation in the domain of health and physical well-being. (R. at 129.)

A second childhood disability evaluation regarding D.H. was conducted in June 2004. (R. at 136-41.) This evaluation was conducted by Dr. Irene Ibler, also a state agency physician. (R. at 137.) Dr. Ibler listed D.H.'s impairments as cerebral palsy and left eye vision loss. (R. at 136.) Dr. Ibler determined, as Dr. Harkness had determined,

4

that D.H.'s "combination of impairments [was] severe, but [did] not meet, medically equal, or functionally equal the listings." (R. at 136.) The result of Dr. Ibler's functional equivalence evaluation was a finding of no limitation in the four domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself. (R. at 138-39.) Dr. Ibler observed a "less than marked" limitation in the domains of moving about and manipulating objects and health and physical well-being. (R. at 139.)

In December 2004, D.H. underwent eye muscle surgery to correct outward deviation of her left eye. (R. at 203-04.) At a February 2005, follow-up examination to this surgery, the operating physician, Dr. Mark Ruttum, determined that D.H.'s visual acuity with correction was 20/25 in her right eye and 20/100 in her left eye. (R. at 150.) In addition, Dr. Ruttum found that D.H. still had a slight amount of exotropia at distance and esotropia at near. (R. at 150.) These findings equated to satisfactory ocular alignment and stable visual acuity in Dr. Ruttum's opinion. (R. at 150.)

B. School Records

There are discrepancies in the record of this case as to how many years D.H. was held back in school. It is clear that D.H. was held back for a second year of kindergarten. (R. at 170, 172, 214.) However, the discrepancy lies in whether D.H. was held back at any other time. Plaintiff's counsel submits that D.H. was held back in kindergarten and third grade; while defense counsel only mentions that D.H. had to repeat kindergarten. (Pl.'s Br. at 3, Doc. #14; Def.'s Mem. in Supp. of the Comm'r's Decision at 6, Doc. #18).

The school psychologist who conducted part of D.H.'s Milwaukee Public Schools Individualized Education Program ("IEP") stated D.H. was held back in

5

kindergarten and third grade. (R. at 171.) Yet, other records from the IEP indicate D.H. was held back only once in kindergarten. (R. at 170, 172.) On the other hand, Heath's testimony before the ALJ was that D.H. had been held back in kindergarten and that teachers wanted to hold her back in fourth grade but decided not to do so in consideration of D.H.'s age. (R. at 214.)

D.H.'s progress report from her first year of kindergarten included comments from the teacher. (R. at 148-49.) The teacher noted with respect to language and literacy that frequently D.H. had difficulty understanding directions, often would not understand the main idea of concepts being taught, and would respond inappropriately to questions. (R. at 148.) In terms of physical development, the teacher stated D.H. struggled with large and fine muscle skills, eye hand coordination, and physical coordination. (R. at 149.)

In May and June of 2005, D.H. underwent an IEP conducted by staff of the Milwaukee Public Schools. (R. at 168-200.) D.H. was eleven years old and finishing fourth grade at the time of this assessment. (R. at 168.) The record indicates D.H. was at an early second grade level in math and reading and at a late third grade level in written language at this time. (R. at 168, 190.) D.H.'s classroom teacher commented her work had been satisfactory and her behavior was good. (R. at 170.) However, this teacher also said D.H. had difficulty with attention span and struggled in math and science. (R. at 170.)

As part of the IEP, the school psychologist tested and observed D.H. (R. at 171.) The psychologist observed that D.H. offered very good effort and persistence to tasks, as well as an age-appropriate or better attention to tasks. (R. at 171.) D.H. responded in a very slow manner to verbal items that required a response, and needed a longer time to process information and to formulate responses. (R. at 171.) D.H. completed the Woodcock-Johnson III Tests of Cognitive Ability and scored low in general

6

cognitive ability (sixth percentile), cognitive efficiency (third percentile), and working memory (ninth percentile). (R. at 171.) Low average to average scores were received by D.H. in verbal ability and thinking ability (eighteenth percentile) whereas average to better scores were received by D.H. in phonemic awareness (seventy-fifth percentile). (R. at 171.) Based on these results, the psychologist believed D.H.'s working memory and difficulty processing information automatically and responding in a rapid and accurate manner could be factors in her learning delays. (R. at 171.)

A diagnostic teacher completed an educational assessment of D.H. for the IEP. (R. at 173-74.) D.H.'s broad reading skills were low compared to other children her age. (R. at 173.) Additionally, D.H.'s skills in basic reading, decoding, reading speed, and ability to comprehend were low. (R. at 173.) In the area of broad written language, D.H. scored a low average. (R. at 173.) According to teacher comments, D.H.'s difficulty generating meaningful sentences hindered written expression and D.H. had difficulty conveying ideas logically and arranging thoughts. (R. at 173.) D.H.'s broad math skills were low, including calculation, math fluency, and applied problems. (R. at 174.) The diagnostic teacher observed that D.H. had difficulty working problems left to right, noting operational signs, regrouping, and recalling steps in math processes. (R. at 174.) Identifying coins, combining coins, and making change were not easy for D.H. (R. at 173.) D.H.'s level of academic knowledge was low average, and the teacher opined D.H. had difficulty acquiring and retaining information from the environment. (R. at 174.)

A speech and language pathologist evaluated D.H. as part of the IEP, and during classroom observation, noticed D.H. had problems answering verbal questions with sufficient detail and that D.H. responded very slowly to questions. (R. at 175.) Also, D.H. was determined to have problems recalling and interpreting auditory directions and she

7

would ask the teacher to repeat or clarify directions as she was confused at times. (R. at 175.) D.H. did not initiate much spontaneous conversation unless encouraged to do so. (R. at 175.) The speech and language pathologist also noted that D.H. would rehearse what she was going to say or repeat the examiner's question before responding. (R. at 175.) Moreover, D.H. was confused by left and right directionality and did not understand the concepts first and last. (R. at 175.) The speech and language pathologist assessed that D.H.'s auditory limitations interfered with her language skills and functional communication due to weaknesses in auditory discrimination, auditory memory, and recall for following oral directions. (R. at 175.) Additionally, the speech and language pathologist opined that D.H.'s overall receptive and expressive language skills were significantly delayed and that there were other areas of weakness such as: listening comprehension, receptive vocabulary, describing and sequencing skills, insufficient verbal responses, and answering complex questions. (R. at 175.) The testing also revealed D.H.'s overall language formulation skills were delayed regarding acquisition and use of forms and structures. (R. at 175.)

The speech and language pathologist conducted a battery of scored tests and found that D.H. scored in the second percentile for core language on the Clinical Evaluation of Language Fundamentals - 4 test. (R. at 176.) The receptive one-word picture vocabulary score was in the third percentile and the expressive one-word picture vocabulary score was in the seventh percentile. On the Test of Auditory-Perceptual Skills, D.H. was in the first percentile for four of eight categories: auditory sentence memory, auditory word discrimination, auditory processing, auditory quotient, and the auditory interpretation of directions score was in the third percentile. (R. at 176.) An orientation and mobility assessment for the visually impaired was conducted and revealed that D.H. had

8

good posture and gait, as well as good balance and coordination. (R. at 177.) As a result, no orientation and mobility services were recommended. *Id.*

The IEP Team met to discuss D.H. after the individual assessments were completed. (R. at 179.) Summary findings from this meeting state that D.H.'s intellectual functioning was in the low range and that D.H. had receptive and expressive communication difficulties which impeded her ability to communicate with adults and peers. (R. at 179.) The IEP Team found that D.H. met the Other Health Impairment and the Speech or Language Impairment criteria for special education assistance. (R. at 183-85.) In noting D.H.'s eligibility for assistance, the IEP Team marked a box on it's eligibility checklist that stated D.H. "demonstrates an impairment of speech . . . or language that significantly affects educational performance or social, emotional or vocational development." (R. at 185.) The IEP Team also indicated D.H. had communication needs that could impede her learning, (R. at 189), and that D.H. had significant delays in her receptive and expressive language skills that affected her ability to communicate effectively during oral participation and academic tasks. (R. at 190.)

C. Witness Statements

A Social Security Administration function report for D.H. was completed in October 2003, when D.H. was nine years old. (R. at 66-75.) It included a comment by Heath that D.H. wears glasses and is blind in the left eye with very little vision. (R. at 67.) In completing the report, Heath marked "no" when asked if D.H.'s ability to communicate was limited. (R. at 69.) The function report further indicated D.H. could not read or understand simple sentences or write a simple story. (R. at 70.) With respect to physical abilities, Heath advised that D.H. could not throw a ball, use scissors, or dress dolls; however, she added that D.H. could ride a bike, jump rope, and use roller skates. (R. at

9

71.) Heath marked "no" when asked if D.H.'s impairments affected her behavior with other people and if D.H.'s impairments affected her ability to cooperate with others in taking care of personal needs. (R. at 73.) The function report further noted D.H. finished her homework but could not keep busy on her own or finish things she started. (R. at 74.)

A relative of the family, answered a Child's Daily Activities Questionnaire regarding D.H. in February 2003. (R. at 48-53.) She commented D.H. limps and her leg twists when she plays and runs. (R. at 49.) The relative stated that sometimes people need to speak slowly and repeat directions to D.H. in order for her to understand. (R. at 50.) According to the relative, D.H. got along well with others in the community and tries not to be different. (R. at 51.) Also, D.H. could care for herself, and she would help her mother clean the house. (R. at 52.)

On August 10, 2006, an ALJ conducted an administrative hearing to take the testimony of Heath and D.H. and to admit evidence for the record in the case. (R. at 207-35.) Heath waived her right to counsel at the beginning of the hearing. (R. at 212.) She testified that D.H. was twelve years old and would be entering sixth grade next year. (R. at 213-14.) Heath described D.H.'s foot surgery and said D.H. still limps and hops. (R. at 216.) In addition, Heath discussed D.H.'s eye muscle surgery to correct a lazy eye. (R. at 217-19.)

Heath stated D.H. had received special education instruction in 2005 and 2006 and would receive similar instruction in the upcoming school year as well. (R. at 219-20.) D.H.'s individual instruction was two levels below regular levels. (R. at 220.) For instance, D.H.'s reading assignments were at a third grade level. (R. at 220.)

D.H. was described as participating in tutoring at the Boys and Girls Club, and as getting very frustrated when she did not understand. (R. at 221-22.) Heath

10

commented D.H. would take almost two hours to get dressed, and she would forget to brush her teeth, use deodorant, and apply lotion. (R. at 223.) Heath noted D.H. gets along with people, but kids tease her and call her slow. (R. at 224.)

D.H. testified that she did not like reading. (R. at 224.) She said she did not understand the little words in books, so she just skipped over them. (R. at 224.) D.H. added that she liked to ride her bike, jump rope, and go skating. (R. at 225.)

D. The ALJ's Decision

1. Disability Standard

An individual under the age of 18 shall be considered disabled for SSI purposes if that individual has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). To be found disabled, a child must show that (1) she is not engaged in performing substantial gainful activity; (2) she has a medically determinable impairment that is severe; and (3) her impairments meet, medically equal, or functionally equal one of the presumptively disabling impairments compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("the Listings"). 20 C.F.R. § 416.924(b), (c), (d).

At step three of the evaluation process, if a child's impairments do not meet or medically equal any Listing, the ALJ must determine whether the child's impairments functionally equal the Listings. 20 C.F.R. § 416.926a. The ALJ considers how the child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b). If the child's impairments result in "extreme" limitation in one domain or "marked" limitation

11

in two domains, the child's impairments will be found to functionally equal the Listings, and the child will be deemed disabled and eligible for benefits. 20 C.F.R. § 416.926a(d).

    2. The ALJ's Determination

        In this case, the ALJ concluded that D.H. was not disabled and, therefore, not entitled to SSI benefits. Proceeding through the sequential test, the ALJ made the following findings: (1) D.H. was a minor at the time of filing and remained so through the date of the hearing; (2) D.H. had not engaged in substantial gainful activity; (3) D.H. suffered from severe impairments related to "cerebral palsy, left lower extremity and borderline intellectual functioning;"[1] (4) D.H.'s impairments did not meet or medically equal any Listing; and (5) D.H.'s impairments did not functionally equal the Listings. (R. at 15-16.) Regarding the functional equivalence finding, the ALJ found that D.H. had a less than marked limitation in the domains of acquiring and using information, moving about and manipulating objects, caring for herself, health and physical well-being, and no limitation in the domains of attending and completing tasks, as well as interacting and relating with others. (R at 16-21.)

        II. STANDARD OF REVIEW OF ALJ'S DECISION

        Under § 405(g), the district court's review of an ALJ's decision is limited to determining whether the ALJ's decision is supported by substantial evidence and is based on the proper legal criteria. 42 U.S.C. § 405(g); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact are conclusive if they are supported by substantial evidence. 357 F.3d at 699. Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v.*

---

[1]The ALJ determined that D.H.'s left eye vision impairment and exotropia were not a severe impairment. (R. at 15.)

*Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). The court cannot re-weigh evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

However, if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.* The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

The ALJ's decision must also demonstrate the path of the ALJ's reasoning, and the evidence must lead logically to the conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). An ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability," *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)), and "build an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he cannot select and discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect both. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The district court should remand the case if the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal quotation marks omitted).

## III. DISCUSSION

Heath asserts the ALJ's decision must be remanded because (1) the ALJ failed to properly assess Heath's and D.H.'s credibility and (2) substantial evidence does

13

not support the ALJ's conclusion that D.H.'s impairments did not functionally equal a listed impairment.

A.  The ALJ's Credibility Assessment

The ALJ is best situated to determine credibility, *Murphy ex rel. Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007); however, the ALJ must comply with SSR 96-7p, *Brindisi ex rel. Brindisi*, 315 F.3d at 787, and give specific reasons for his determination that are supported by the record, *Murphy ex rel. Murphy*, 496 F.3d at 635. The ALJ must consider the entire case record in determining credibility, and statements about the intensity or persistence of symptoms or about the effect of symptoms on functioning may not be rejected simply because they are not substantiated by objective medical evidence. SSR 96-7p. SSR 96-7p requires consideration of (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Further,

> [i]t is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

14

In *Zurawski*, the Seventh Circuit remanded for reconsideration of the claimant's credibility regarding pain. The ALJ found the claimant's testimony regarding pain not entirely credible, citing inconsistencies with the objective medical evidence but not further explaining those inconsistencies. 245 F.3d at 887. The ALJ mentioned the findings of four physicians that stated the claimant could return to work but failed to discuss MRI results supporting Zurawski's complaints and the medications he had used to relieve pain. *Id.* at 888. The Seventh Circuit remanded for reconsideration by the ALJ because the court was unable to determine whether the ALJ had examined all relevant evidence including the MRI results and claimant's medications. *Id.*

The Commissioner argues the ALJ was not required to provide a detailed analysis of every statement in the record. However, the ALJ must examine the evidence favoring the claimant as well as the evidence favoring the claim's rejection because review of the substantiality of the evidence takes into account whatever in the record fairly detracts from its weight. *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986). Moreover, the ALJ is required to "sufficiently articulate [his] assessment of the evidence to assure the court that [he] considered the important evidence and to enable the court to trace the path of [his] reasoning." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (citing *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). In making his credibility assessment in this case, the ALJ did not address the numerous IEP accounts that would provide credence to both Heath's and D.H.'s statements. The reviewing court in *Zurawski*, was unclear whether the ALJ had examined all relevant evidence; but here the task is easier as the ALJ simply did not address the speech and language impairment evidence in the record when weighing Heath's and D.H.'s credibility.

15

Further, the ALJ's credibility assessment indicated that "the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible." (R. at 16.) The ALJ noted D.H.'s left foot surgery had been relatively successful and cited the IEP Program for the Visually Impaired Orientation and Mobility evaluation stating that D.H. had good posture and gait, her balance and coordination were good, she demonstrated age appropriate orientation and mobility skills, and that no orientation and mobility services were being recommended. Regarding D.H.'s low intellectual functioning, the ALJ referred to the IEP inasmuch as D.H. gave very good effort and persistence to task during written work, her behavior was good, and she was diligent, focused, respectful, and enthusiastic. The ALJ further recited that D.H. had friends, was well liked, and with some prompting was independent in activities of daily living.

The speech and language portions of the IEP are significant pieces of evidence that would offer support for Heath's and D.H.'s credibility. Heath stated D.H. would go to the Boys and Girls Club for tutoring after school, but then later at home, D.H. would still get frustrated and not understand her work. (R. at 222.) During the hearing, Heath described how D.H.'s younger sister would help her with her homework. (R. at 222). Heath also testified D.H.'s friends would tease her and call her slow. (R. at 224). D.H. said at the hearing that often times she would not understand words in books so she would just skip them or stop reading and watch television or just blank out instead. (R. at 224). These statements are supported by numerous findings from the IEP that were not included in the credibility assessment. For instance, the speech and language pathologist's evaluation notes D.H. had difficulty recalling and interpreting auditory directions during math and science and D.H. would ask her teacher to clarify oral directions. (R. at 175).

16

The pathologist also assessed that D.H.'s auditory skills interfered with her language skills and functional communication and that D.H.'s overall receptive and expressive language skills were significantly delayed. (R. at 175.) Further IEP evidence includes findings that D.H. did not initiate spontaneous conversation unless encouraged, D.H. lacked self-confidence when conveying thoughts, and that responses to questions were slow. (R. at 175). This was significant evidence that the ALJ did not include in his credibility assessment. Such evidence would attest to the claimant's daily activities, the frequency of claimant's symptoms, and other factors concerning the claimant's functional limitations that the ALJ was required to address in assessing credibility. Hence, the ALJ's finding that Heath and D.H. were not fully credible is not supported by the record without an adequate examination of the IEP evidence. *Murphy ex rel. Murphy*, 496 F.3d at 635. Consequently, the ALJ failed to adequately discuss the evidence in light of the SSR 96-7p standards.

B.  The ALJ's Functional Equivalence Determination

Plaintiff challenges the ALJ's findings that D.H.'s severe impairments did not functionally equal the Listings. Specifically, plaintiff alleges the ALJ erred when he found D.H. did not have a marked or severe limitation in the domains of acquiring and using information and interacting and relating with others. The Commissioner retorts that the ALJ's functional equivalence findings are supported by substantial evidence.

An ALJ must fully develop the record before reaching conclusions and adequately articulate his analysis so that the court can follow his reasoning. *Murphy ex rel. Murphy*, 496 F.3d at 634 (internal citations omitted). It is not enough for the ALJ to simply cite evidence that supports his conclusions. *Herron*, 19 F.3d at 333. Evidence favoring

17

as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect both. *Zurawski*, 245 F.3d at 888.

In *Murphy ex rel. Murphy*, the Seventh Circuit remanded an ALJ decision and found the ALJ's decision was not supported by substantial evidence when the ALJ ignored substantial evidence that would support a finding of disability. *Murphy ex rel. Murphy,* 496 F.3d at 632-34. The ALJ did not explain why he gave no weight to portions of school documents which supported claimant's disability. *Id.* at 634. The school records outlined how claimant was having difficulty at school due to his short attention span and how claimant was losing things, working very slowly, and struggling to complete assignments. *Id.* In the ALJ's discussion of the school records, the ALJ noted the claimant was cooperative, tried to follow rules, and wanted to do well in school. *Id.* The court was unimpressed with this summary and stated, "These traits may well be accolades for [claimant], but the ALJ did not explain how or why they trump the evidence of his [disability]." *Id.* at 635. As a result, the court determined a reasonable person could not accept the ALJ's reasoning as adequate to support the decision and remanded for review of these school records. *Id.*

Similar to *Murphy ex rel. Murphy*, the ALJ in this case ignored significant portions of the Milwaukee Public Schools IEP record. In the domain of acquiring and using information, after three paragraphs citing code provisions, the ALJ found:

> The claimant has less than marked limitation in acquiring and using information.
> Although the claimant does have some cognitive impairment, she is still able to initiate, sustain and complete activities. Her teachers noted that she has very good work habits, works cooperatively in groups and participates well. She gave very

18

good effort and persistence while completing written evaluations for her IEP.

The claimant is approximately one year behind her grade level and she was held back a year in school while in kindergarten. Although the state agency consultants felt the claimant had no limitation in this domain the fact that the claimant is behind in school demonstrates at least some limitation of function.

(R. at 171) (internal citations omitted). However, the ALJ failed to include or explain why he failed to include the body of IEP evidence that supported a finding that D.H. had at least a marked limitation in acquiring and using information. The school psychologist found D.H. needed a longer time to process information and formulate responses. (R. at 171.) The IEP diagnostic teacher commented D.H. had difficulty conveying ideas logically and arranging thoughts. (R. at 173.) Morever, the diagnostic teacher opined D.H. had difficulty "acquiring and retaining information from the environment." (R. at 174.) The school psychologist believed D.H.'s working memory and difficulty processing information automatically and responding in a rapid and accurate manner could be factors in her learning delays. (R. at 171.) The speech and language pathologist cited that D.H. had difficulty answering verbal questions with sufficient detail and that D.H. found it difficult to recall and interpret auditory directions. (R. at 175.)

In the domain of interacting and relating with others, again after citing three paragraphs of code provisions, the ALJ determined that:

The claimant has no limitation in interacting and relating with others.

Again, the claimant's teachers indicate that the claimant gets along well with her classmates. At the hearing the claimant's mother testified that the claimant played with her friends and admitted to the undersigned that the claimant got along well with others. The state agency consultants agree with the undersigned that the claimant has no limitation in interacting and relating to others.

19

(R. at 19) (internal citation omitted).

In the vein of *Murphy ex rel. Murphy*, nice kids can be disabled, too, and the IEP record supports that conclusion. The IEP summary findings included statements that D.H. had receptive and expressive communication difficulties that impeded her ability to communicate with adults and peers and significant delays in her receptive and expressive language skills that affected her ability to communicate effectively during oral participation and academic tasks. (R. at 171, 190.) The school psychologist stated D.H. would respond in a very slow manner to verbal items that required a response. (R. at 171.) The speech and language pathologist noted D.H. would respond very slowly to questions and D.H. would not initiate much spontaneous conversation unless encouraged. (R. at 175.) The pathologist also observed D.H. would rehearse what she was going to say or repeat the examiner's question before responding. (R. at 175.) The pathologist found that D.H.'s auditory skills interfered with her language skills and functional communication. (R. at 175.) The IEP evaluation additionally stated D.H. exhibited weaknesses in auditory discrimination, auditory memory, and recall for following oral directions. (R. at 175.) The pathologist concluded D.H.'s overall receptive and expressive language skills were "significantly" delayed. (R. at 175.)

The ALJ's reasoning is not sufficient inasmuch as it does not set forth the required explanation for why strong evidence favorable to the claimant was overcome by the evidence the ALJ cited. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007) (citing *Zurawski*, 245 F.3d at 889).

The Seventh Circuit has observed the "ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the

20

statute requires him to do." *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).  Here, the court is left to wonder whether the ALJ considered all of the evidence.  *See Brindisi ex rel. Brindisi*, 315 F.3d at 786 (remanding case for lack of substantial evidence when the ALJ failed to address claimant's strongest piece of evidence).  Therefore, this court must conclude that the ALJ's determination that plaintiff's severe impairments did not functionally equal a Listing is not supported by substantial evidence.  For the aforementioned reasons,

IT IS ORDERED that the decision of the Commissioner is reversed and this case is remanded pursuant to sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 21st day of October, 2009.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

21